IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 12, 2023

## LARRY J. BRADLEY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 2015-CR-9     William R. Goodman, III, Judge**

_____

### No. M2023-00119-CCA-R3-PC

_____

Petitioner, Larry J. Bradley, appeals from the Montgomery County Circuit Court's denial of his petition for post-conviction relief related to his convictions for evading arrest, attempted carjacking, aggravated burglary, and assault. Petitioner argues that the post-conviction court erred in denying relief based upon his claims that he received ineffective assistance of counsel because (1) trial counsel argued that Petitioner was guilty of attempted carjacking without consulting with Petitioner and (2) trial counsel failed to properly determine the felony classification for Petitioner's Indiana convictions for purposes of sentencing. He also argues the "Circuit Court erred in denying [Petitioner's] petition to set aside the sentence on the attempted carjacking conviction due to the ineffective assistance of counsel." After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

David Haggard (on appeal) and Gordon W. Rahn (at hearing), Clarksville, Tennessee, for the appellant, Larry J. Bradley.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert J. Nash, District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from events following a high-speed chase that occurred on November 4, 2014, in Cheatham and Montgomery Counties. Petitioner was subsequently charged with evading arrest, aggravated burglary, carjacking, and assault. After a February 16-17, 2016 jury trial, Petitioner was convicted of evading arrest, aggravated burglary, attempted carjacking, and assault. No direct appeal was filed in this case. The trial transcript was exhibited to the post-conviction hearing and reflected the following factual and procedural history:

On the first day of trial, Petitioner asked to speak to the court. Petitioner stated that the trial court had appointed trial counsel in early January 2016. According to Petitioner, trial counsel told him that he would be mailing him a packet of information, which Petitioner needed to review carefully and decide what he wanted to do. Petitioner said that he did not receive the packet until Thursday, February 11, and that he reviewed it with trial counsel for the first time on Monday, February 15, at 1:00 p.m. Petitioner averred that the contents of the packet made him look at his case "totally different[ly]" and that, if he had been give more time to discuss and review it, "[W]e wouldn't be right here at the moment that we are in right now with the [c]ourt." Petitioner requested that the trial court allow him to "fire" trial counsel because he was uncomfortable with counsel's representing him.

The trial court noted that Petitioner was originally represented by the Public Defender's Office; that Petitioner pleaded guilty in September 2015, but was allowed to withdraw his plea; and that on November 19, 2015, Petitioner's pro se motion for appointment of another attorney was granted and trial counsel was appointed. On February 5, 2016, the State filed a Notice to Seek Enhanced Punishment ("State's notice") of Petitioner as a Range III offender. The notice listed eleven prior convictions, all from the State of Indiana; three of the convictions were listed as Class D felonies, six were listed as Class C felonies, and two had no felony classification listed. Petitioner interjected that this was his first time hearing of the notice and that, after he withdrew his guilty plea, he knew the State was seeking to have him sentenced as a Range II offender.

Petitioner again moved for appointment of new counsel. The trial court denied Petitioner's request, stating that it was running out of lawyers to represent Petitioner and that the case would proceed to trial. The State noted for the record that it had initially made Petitioner a "very good offer" related to Petitioner's withdrawn guilty plea and that Petitioner's original counsel and trial counsel had conveyed to the prosecutor that Petitioner was getting "jailhouse lawyering." The State said, "Everyone has tried to tell him, his perception of what constitutes these offenses are not the same as the legal definition."

- 2 -

The State then made a revised offer for Petitioner to enter a guilty plea as a Range II offender to carjacking and aggravated burglary, with the sentence length to be set by the trial court and for the sentences to be aligned concurrently. The State noted that the offer would not change if Petitioner had a different attorney.

Petitioner stated that he did not trust trial counsel and that counsel was not going to represent him. He said that, if he had received the packet of information sooner, he would have accepted the State's plea offer. The trial court noted that Petitioner's first plea agreement was to plead guilty to carjacking and aggravated burglary, with a cap on the sentences and an agreement for the sentences to run concurrently with Petitioner's Cheatham County case. Petitioner agreed to speak to trial counsel privately. Trial counsel then stated that Petitioner wanted a recess to think about the revised plea offer.

After the recess, Petitioner told the trial court that he was mentally and emotionally "drained" and that he did not know if he could make a decision. He said that he was willing to plead guilty but that he needed to confer with his family and the chaplain. The trial court told Petitioner that he could either plead guilty now or proceed to trial. The State offered a final agreement for Petitioner to enter an open guilty plea as a Range II offender to carjacking and as a Range I offender to aggravated burglary, which put his sentencing exposure at twelve to twenty-six years. Petitioner remained silent, which the trial court interpreted as his decision to proceed to trial.

### Jury Trial

Trial counsel's opening statement reflected that the defense theory was that, although the witness testimony would establish "[w]hether there was a slight amount of entry" of a residence, Defendant had no intent to commit a felony therein. Trial counsel stated that Petitioner was willing to admit that he attempted to steal a car and that he struck the car's owner after the owner struck him, but that he was guilty of assault and theft,[1] not carjacking.

Cheatham County Sheriff's Deputy Jason Hundley testified that, on November 4, 2014, he and his partner were traveling in an unmarked police cruiser and that, along with a marked police cruiser, they were following a silver Lexus. When both police cars activated their blue lights, the driver of the Lexus did not stop; the marked cruiser pulled to the side and front of the Lexus, and the Lexus "side checked" or side-swiped it. Deputy Hundley called for assistance as they approached the Montgomery County line. He

---

[1] The trial transcript reflects that trial counsel later sought to have the jury instructed on theft as a lesser-included offense of carjacking. The trial court declined after concluding that theft was not a lesser-included offense of carjacking. *See State v. Wilson*, 211 S.W.3d 714, 721-22 (Tenn. 2007).

- 3 -

estimated that the Lexus generally drove between fifty and sixty miles per hour, although it reached speeds of 112 to 115 miles per hour; Deputy Hundley's vehicle could not safely reach that speed, and his estimate was based upon the speed reached by the marked police cruiser. Deputy Hundley noted that it was dark outside and that the traffic was heavy because it was Election Day.

Deputy Hundley testified that he lost sight of the Lexus but that, as he came upon the t-shaped intersection of Ashland City Road and the Clarksville bypass, he saw smoke and a red pickup truck with front-end damage. The Lexus was sitting across the road, and the driver was gone; the officers began to search for him in a nearby wooded area.

Clarksville Police Officer Bill Van Beber III testified that he was a crash investigator and that he spoke to Petitioner about the November 4, 2014 crash. The silver Lexus was registered to Petitioner, and Petitioner admitted that he was driving at the time of the crash. Petitioner stated that he was wearing a seatbelt and that he was sore and bruised but otherwise uninjured. When asked why he left the scene, Petitioner responded that "he was eluding the police and that's why he left." Officer Van Beber stated that there were 120 feet of skid marks related to the crash, which meant that Petitioner slowed down between thirty-five and fifty miles per hour before he hit the pickup truck. Officer Van Beber noted that, although he had not performed a full accident reconstruction, he could tell that Petitioner was "well over the speed limit"; the pickup truck was probably driving at about the speed limit and suffered "extensive" damage. Officer Van Beber said that the speed limit in the area was between forty-five and fifty miles per hour. Officer Van Beber stated that Petitioner was "extremely lucky" not to have been seriously injured.

Kevin Hannon III testified that, on November 4, 2014, he lived in a neighborhood adjacent to the Clarksville bypass intersection. Mr. Hannon was serving in the Army and had returned from Afghanistan in late September 2014. He was watching television with his wife and two minor children when there was an unexpected knock on the door. Mr. Hannon turned on a light and saw Petitioner, who was sweaty and worried-looking, standing very closely to the glass pane in the door. Mr. Hannon had never seen the man before; he described Petitioner as having a goatee and wearing a dark, long-sleeved shirt. Mr. Hannon asked Petitioner what he wanted without opening the door, and Petitioner responded, "[C]ell phone, flat tire, flat tire, let me in, cell phone, flat tire." Mr. Hannon asked his wife to get the telephone, and he asked Petitioner to back up from the door. He noted that people had come to his house asking for help before and that he was a mechanic.

Mr. Hannon testified that Petitioner backed up, that he opened the door a little, that he heard a police siren, and that Petitioner "just ran in on me." Petitioner pushed the door into Mr. Hannon, knocking him backward onto his sofa. Mr. Hannon stated that his home had a tiled entryway area and that Petitioner made it far enough inside to pass the tiles,

such that Mr. Hannon "had to grab him from behind and pull him" to prevent him from entering further. Mr. Hannon reiterated that Petitioner made it past him into the house. Mr. Hannon stated that he wrestled with Petitioner, who was holding on to the wall or door frame, and that he used the front door to hit Petitioner until he let go. Mr. Hannon noted that Petitioner struck him in the right side, leaving bruises; he identified a photograph of the bruising.[2] He denied that Petitioner said anything during the scuffle, had a weapon, or took anything. Mr. Hannon also denied putting Petitioner in a headlock or grabbing him by the neck. Mr. Hannon stated that, when he got Petitioner outside, he told Petitioner to leave and that Petitioner ran away. Mr. Hannon denied ever giving Petitioner permission to enter the home. Mr. Hannon said that he could see a Knights of Columbus residential home from his house.

Jessica Hannon, Mr. Hannon's wife, testified consistently with Mr. Hannon about the initial part of the incident. She stated that she went to the next room to retrieve the landline telephone and that she heard scuffling; when she came back into the living room, she saw Mr. Hannon struggling with a man, who had braced himself against the door, and trying to get him out of the house. She did not get a good look at the man, but she affirmed that he was a couple feet inside the threshold of the house.

Simone Hunter testified that she worked at the Sunrise Community Home, also known as the Knights of Columbus residential home, across from the neighborhood in which the Hannons lived. On November 4, 2014, she and Ericka Farrow were working the evening shift; she noted that there was a car accident nearby and that traffic was stopped on the main road connecting to the home's driveway. Ms. Hunter stated that Petitioner walked in, greeted her, and told her that he was here to see "her," pointing at Ms. Farrow. Ms. Hunter had never seen Petitioner before and did not think Ms. Farrow knew him. Ms. Farrow was sorting the residents' medication, and Petitioner briefly conversed with her before exiting a side door with Ms. Farrow. Ms. Hunter stated that she went out the front door because the situation did not feel right.

Ms. Hunter testified that Petitioner walked to the driver's side of Ms. Farrow's car, and Ms. Farrow checked the passenger side as though something was wrong. Petitioner entered the car, and Ms. Farrow yelled for Ms. Hunter to call 911 before entering the front passenger's seat. Ms. Hunter saw Ms. Farrow fighting with Petitioner, then the car "took off" into a ditch at the end of the driveway. Ms. Hunter noted that she saw Petitioner hit Ms. Farrow with one hand and that he had his other hand on the steering wheel. Ms. Hunter stated that Petitioner jumped out of the car and ran away, whereas Ms. Farrow was knocked backwards out of the passenger-side door. Ms. Hunter said that Ms. Farrow hit her head on the windshield and was bruised.

---

[2] The trial exhibits were not included in the post-conviction record.

Ms. Farrow testified that, on November 4, 2014, she drove a gold sedan with darkly tinted windows. She said that Petitioner came to her work; she noted that she had never seen him before and that she told Ms. Hunter that she did not know him. Ms. Farrow stated that Petitioner told her that her car window was broken on the passenger side. She responded that this could not be true, and Petitioner repeated that someone might have broken the window. Ms. Farrow was sitting at a table with the keys to the medicine cabinet beside her, and Petitioner grabbed the keys and asked for the keys to her car. Ms. Farrow took the keys back and asked why he wanted her car keys. According to Ms. Farrow, Petitioner kept repeating that something was wrong with her passenger-side window. Ms. Farrow stated that she was irritated about a stranger's approaching her and that she went outside with Petitioner to check her car.

Ms. Farrow testified that she verified that her car was undamaged and that she told Petitioner, "[T]hat's some bulls--t, there is nothing wrong with my car." Ms. Farrow's keys were inside the car; Petitioner stated, "Okay, so this is the car, so let me—" before he jumped into the driver's seat. Ms. Farrow stated that she was blind in her left eye and that she entered the front passenger's seat facing backwards so that she could see Petitioner. Ms. Farrow testified that Petitioner started the car and that she grabbed her keys but that the car key may have broken off in the ignition because the car continued to run. Ms. Farrow and Petitioner fought over the gear shift. Petitioner told Ms. Farrow that he was looking for a car to get into and that "they've done me bad." He also said, "B--ch, don't fight me over your car." Ms. Farrow told Petitioner that her car was how she got to her job and made money to help her family. She stated that Petitioner started to drive forward while hitting her, and she hit back. Ms. Farrow noted that Petitioner was steering with one hand. She asked Petitioner where he was going to go because traffic was at a standstill, and he could not exit the driveway. Petitioner ultimately drove the car into a ditch at the end of the driveway, at which point the air bags deployed and he ran away, leaving a shoe behind in the car.

Ms. Farrow testified that Petitioner had control of her car and that she never gave him permission to drive it. Ms. Farrow identified photographs of her injuries, which included a bump on her head, a black eye, scrapes and bruises, and a puncture wound on her shoulder. Ms. Farrow stated that, as she sat at the table in the medication room, the side door was to her left; the door was always locked from the outside, and she would not have been able to see if someone was looking through the window in the door. She said that the key ring for the medicine cabinet would have been visible on the table from the door.

Ms. Farrow agreed that Petitioner did not force her to leave the building. She acknowledged that, in her police statement, she said that she hit Petitioner first; she noted that she was in shock after the incident and may not have "put things in proper order." Ms.

Farrow agreed that her memory was better at the time she gave the statement. She said that she was still upset with Petitioner because he "messed with [her] livelihood."

Former Clarksville Police Officer Zachary Upton testified that he responded to the call for assistance during the high-speed chase and that he saw Petitioner drive his Lexus through the Clarksville Bypass intersection, although he did not recall if he saw a collision. Mr. Upton stated that other officers conveyed that Petitioner had run into a nearby woodline; he drove into the neighborhood on the other side of the woods when he received a call from the Hannons reporting a home invasion. Mr. Upton spoke to the Hannons and traveled east based upon their description of Petitioner's flight. A short time later, Mr. Upton received a call from dispatch about a carjacking in progress. Upon his arrival at the Knights of Columbus home, he saw a vehicle in a ditch with a shoe in the driver's side floorboard. Mr. Upton noted that the shoe matched another shoe inside the silver Lexus. Motorists who were stopped on the bypass yelled to him that the driver ran in a certain direction; officers found Petitioner about one hour later in a wooded area. When Petitioner surrendered, he was barefoot and asked the officers if "all this was necessary" and whether a police helicopter had "heat seeker" on it.

Clarksville Police Department Detective Gregory Rosencrants testified that he interviewed Petitioner after Petitioner had been cleared by the hospital; Petitioner agreed to speak to him. According to Petitioner, he knocked on the Hannon's door and tried to tell Mr. Hannon that he had a flat tire and had been in an accident, although he may have been incoherent. Petitioner stated that Mr. Hannon asked him, "[W]hat, what, what," before cracking the door open and putting Petitioner in a headlock. He stated that Mr. Hannon said, "[G]et away, get away, you are not coming in my house," and that Ms. Hannon said she would call the police. Petitioner stated that he broke free and ran off.

Detective Rosencrants testified that he asked Petitioner if he had a history of breaking into houses; in response, Petitioner asked him for the legal definition of burglary. When Detective Rosencrants provided the definition, Petitioner became agitated, and he stated that he never tried to get into the house. Detective Rosencrants stated that Petitioner was concerned about being accused of trying to enter the house. Detective Rosencrants said that Petitioner stated, "I am not going to try to go into anybody's house because the police [are] after me and I ain't that stupid." Petitioner also said that it "probably wasn't good to spook his family like that" and that he did not mean to upset the family.

Detective Rosencrants testified that Petitioner did not appear as concerned about the carjacking as the burglary. He said Petitioner claimed that he asked the lady for her car, pushed the lady, and somehow went into a ditch. Petitioner did not remember a lot other than going to the house, talking to a lady, and struggling with her. He denied telling her that her window was broken. When Detective Rosencrants defined carjacking as "when

you try to take someone's car by use of an assault," Petitioner responded, "I definitely did that."

Detective Rosencrants testified that, although Petitioner was coherent and appeared to understand what was happening, his mental state was "all over the place," and he would change topics mid-conversation. Petitioner had some bruises and maybe a knot on his head, and his leg was bandaged, but by Detective Rosencrants' assessment, Petitioner had no significant wounds or injuries. Detective Rosencrants did not know if Petitioner received medication at the hospital. Detective Rosencrants stated that the first question Petitioner asked was about the condition of the driver of the pickup truck.

During a recess, the State noted that the grand jury had indicted Petitioner for aggravated burglary based on committing or attempting to commit an assault at the Hannon's house. The State rested its case, and Petitioner chose to testify. Petitioner testified that, after the car accident, he "took off running," and that one of his shoes came off in the car or in the mud. Petitioner noted that he was "running to evade the police." Petitioner stated that running in the hilly wooded area without a shoe hurt his foot and that, when Mr. Hannon answered the door, Petitioner was out of breath such that he could not clearly answer Mr. Hannon's questions. Petitioner stated that he attempted to convey that he had a car wreck, and then he stated that he had a flat tire and asked to use Mr. Hannon's telephone. Petitioner said that he stood on a porch "closer to the ledger (sic) part" on one foot to take pressure off of his injured foot. He noted that Mr. Hannon was agitated by his inability to speak clearly.

Petitioner continued,

Okay, so when I was outside the door, I hear sirens . . . I was right on his door as [Mr. Hannon] had testified. So, I am standing there with one foot, I hear the sirens. My shoulder hits this door. When it does that, I didn't know that his door was partially open and so his door flew open about a quarter of the way. I see Mr. Hannon fall back on a couch or something that he had in his area right there. I am standing right on the ledger part on the outside of the door. That's when I am standing there. I am watching Mr. Hannon. He gets up, he grabs me. I duck up under -- from grabbing me in the doorway. He is saying some things. I can't really make out what he is saying. I duck up from up under it, and I took off running. So now, I am back running in the woods and as I am running, I am hearing someone say call the police . . . . I am running with one shoe on in the woods in Montgomery County with an attempt to evade the police at this point from a car accident that I had there.

- 8 -

Petitioner noted that he heard a helicopter as he ran through the woods and that he thought, "[T]his is a really serious pursuit matter[.]" He said that, as he approached the Knights of Columbus home, he saw a vehicle in the parking lot with a broken window. He stated that he entered the home, that Ms. Hunter asked what he wanted, and that he pointed to Ms. Farrow and said he needed to speak with her. Petitioner noted that he wanted a place to rest and that he was unable to do so because Ms. Hunter kept asking him questions. Petitioner said that he told Ms. Farrow about the broken car window because he saw "elderly people there and I knew it wasn't a place for me to be there, and I knew that the police were in pursuit of me, so I was really just trying to remove myself from that particular area there."

Petitioner testified that Ms. Farrow followed him outside, noting that he did not force or intimidate her. Petitioner stated that he heard the helicopter again and that he sat down in the driver's seat. He said that Ms. Farrow was trying to talk to him from outside the car and that she was becoming aggravated. Petitioner said that Ms. Farrow entered the car, said, "[Y]ou are not taking my car," and began hitting him. Petitioner averred that he told Ms. Farrow several times that he was not taking her car and that he "shielded [him]self by keeping her [at] a little distance from me[.]"

Petitioner explained,

Now, what led [Ms. Farrow] to believe that I was trying to take her car is when I sat down in the car and when I heard the helicopter, I took the ignition key and I tried to turn on the inside light of her vehicle, because when I sat in the car, she had an extremely dark tint on her car and I couldn't see anything . . . . [so] I kept my foot on the brake and when she seen (sic) that, she attacked me. She thought I was trying to take her car, as she said, and she hit me.

He noted that he had his injured foot on the brake. Petitioner stated that he "took her hitting [him] upside the head several times" before he hit her back. He stated that, as they traded blows, "something hit the accelerator, the car goes up forward, hits a ditch and it just shot like Ms. Hunter said, just straight and boom! It hits the ditch[.]" Petitioner stated that Ms. Farrow called him names and that he jumped out of the car, leaving his other shoe behind, and ran away into the woods. Petitioner said that he became exhausted and could not move anymore. He stated that, when he was arrested, he asked the officer if "all this" was necessary.

Petitioner testified that he went to the hospital and received medication for his injuries. He stated that he agreed to talk to Detective Rosencrants and "immediately asked about the lady that I hit, because I did assault her[.]" He stated that he also asked whether

the other driver he hit was okay. Petitioner repeated that he admitted to assaulting Ms. Farrow, noting that he would not have normally hit her and that he did not "feel good about that." Petitioner averred that he had no intention of taking Ms. Farrow's car and that he was "just trying to sit there and get my thoughts together."

On cross-examination, Petitioner testified that he first heard a helicopter after he left Mr. Hannon's house. He agreed that the police tried to pull him over before he was in Montgomery County. He stated that the police were still behind him, that he did not realize the Clarksville Bypass intersection was t-shaped, and that he braked but could not make the turn. When asked why he chose to run from the police, Petitioner replied, "Bad decision." Petitioner noted that he did not know if he had a concussion and that the hospital did not do a CT scan. He agreed, though, that he was able to run up and down the hillside for an hour after the accident. Petitioner said that his shoulder hit Mr. Hannon's door as he tried to get his balance in an effort to turn and leave; Petitioner stood and gave a demonstration of how his shoulder came to press on the door. He agreed that the movement knocked Mr. Hannon back, although he denied that he "rammed" his shoulder into the door. Petitioner maintained that, when the door fell open and Mr. Hannon fell back, he remained outside of the doorway, at which point Mr. Hannon grabbed him by his head. Petitioner stated that he slid out of Mr. Hannon's grasp, turned, and ran away.

Petitioner acknowledged that he did not tell Detective Rosencrants about his injured foot, Mr. Hannon's becoming irritated, or Petitioner's falling into the door and knocking Mr. Hannon backwards. He said that he "may have" told the police that he did not recall why he went to Mr. Hannon's door. Petitioner stated that he did not go into details with Detective Rosencrants because the detective was "more concerned about if there was a crime committed[.]" He agreed that, in his police interview, he denied hearing any sirens when he was at Mr. Hannon's house. Petitioner stated that his mind was clear enough at the time of the interview to say that he did not commit burglary because "it didn't fit [his] character."

Petitioner testified that, if Mr. Hannon had given him a telephone, he was going to call his family and ask for a ride. Petitioner acknowledged that all his family was in Indiana and Louisiana, and he noted that he was going to run to a hotel once he ascertained his location. When asked why he did not ask Ms. Hunter or Ms. Farrow to use a telephone, Petitioner stated that he was "way more tired" and disoriented. Petitioner said that he told Ms. Farrow that her car window was broken because he "was running in the woods . . . . [he] had one shoe off, [he] had mud, looked a serious mess and in front of people -- there were elderly people there." He also said that he did not know why he told Ms. Farrow about the car with the broken window and that it was "just an idea." Petitioner denied having looked at Ms. Farrow through the side door window before he entered the building.

- 10 -

Petitioner testified that he knew he had to get away from the Knights of Columbus house and that he intended to run away. When asked why he entered the house if he intended to run away, Petitioner stated that he heard a helicopter and needed to evade it. Petitioner did not know why he did not turn around and leave when he realized elderly people were in the building. He denied, though, that he intended to take a car.

Petitioner testified that, when he was outside with Ms. Farrow, he was not paying attention to her. Petitioner stated that he could not justify hitting Ms. Farrow just because she hit him first. He noted that he initially "accepted" her blows. He said that he "responded wrong. Definitely, and I did assault her . . . but that's a far cry from trying to take her car and actually carjacking her." Petitioner attributed Ms. Farrow's attacking him to misinterpreting his purpose in starting the car and having his foot on the brake. He stated that she did not know he was "in duress" and that he did not have time to explain his situation to her. Petitioner denied calling Ms. Farrow a "b--ch" and telling her not to fight him for the car. He asserted that, if Ms. Farrow had not started fighting him, he was going to "get out and run away."

When asked about his police statement, in which he told Detective Rosencrants that he only recalled asking a lady for her car and the car's going into a ditch, Petitioner stated that he did not go into "great detail about things." He denied that he "c[a]me up with" the details of his story after hearing all the evidence at trial. Petitioner said that he was only referring to the assault when he told Detective Rosencrants that he "definitely did that." He stated that he denied trying to take the car and that his "interpretation" of Detective Rosencrants' statement was that he was referring to the assault. Petitioner agreed that an officer told him at the hospital that he was facing an assault charge.

Petitioner averred that he admitted to everything he did during the police interview, which was running from the police and wrecking his car. He agreed that Detective Rosencrants told him his car had been towed and that his shoe, identification, and "paperwork" were all in it.

On redirect examination, Petitioner testified that he did not have a "strong state of mind" with respect to his decisions that night because he had just been in a car accident. He asserted that his goal in entering Ms. Farrow's car was to sit down and "get [his] second wind" before attempting to walk across the stopped traffic on his wounded foot. He agreed that he was "running scared."

Mr. Upton was recalled as a rebuttal witness and testified that a helicopter first became involved in the search for Petitioner about twenty or thirty minutes after the carjacking occurred. He did not know, however, when the helicopter was called. Mr.

Upton stated that he noticed the helicopter as soon as it arrived because it was circling the area.

During Petitioner's closing argument, trial counsel stated that Petitioner was "not trying to hide what happened" and that he admitted going to Mr. Hannon's house and the Knights of Columbus house, as well as getting into Ms. Farrow's car. Trial counsel noted that the jury's job was to determine which story presented by the witnesses was true. Trial counsel continued,

> I am asking you today to find my client guilty of certain charges. He is guilty of attempted carjacking. We are asking you -- we started the conversation by saying we want you to find not that nothing happened, but it is not as much as the State is putting on. We are also asking that you consider the Aggravated Criminal Trespass Statute, which says, "any person who commits the offense of aggravated criminal trespass is guilty of a crime. For you to find them guilty of the offense, the State must prove beyond a reasonable doubt the existence of the following essential elements: the Defendant entered or remained on a property; the Defendant knew at the time of entering the property or remaining that he did not have the owner's effective consent to do so and that the Defendant intended, knew or was reckless about his presence and that it would cause fear to the safety of another."

> My client never said that he didn't do anything. We are not saying nothing happened. We are just saying consider some of these lesser-includeds because when you look at the entire story that you have been given, the things that you know beyond a reasonable doubt equate to these charges.

The jury convicted Petitioner of evading arrest, attempted carjacking as a lesser-included offense of carjacking, aggravated burglary, and assault. Although an order allowing trial counsel to withdraw was not included in the post-conviction record, the post-conviction court's order denying relief states that trial counsel filed a motion to withdraw from Petitioner's case on June 9, 2016, citing a breakdown in communication. A new attorney appeared on Petitioner's behalf at subsequent court dates.

- 12 -

## *Sentencing Hearing*

Prior to a sentencing hearing, the State filed a response to Petitioner's sentencing memorandum,[3] which included offense dates and certified copies of the charging instruments and judgments for the following convictions:

| Offense Date | Case No. | Court | Conviction | Felony Class | Sentence |
|---|---|---|---|---|---|
| 5/23/91 | 82D02-9105-CF00239 | Vanderburgh, Indiana Superior Court | Attempted theft of property[4] | D Felony | One year |
| 4/30-5/1/91 | 82D02-9109-CF00398 | Vanderburgh, Indiana Superior Court | Theft of property | D Felony | One year |
| 11/5/93 | 82D02-95403-CF00095 | Vanderburgh, Indiana Superior Court | Forgery | C Felony | Three years |
| 2/26/96 | 65C01-9601-CF00003 | Circuit Court for Posey County, Indiana | Forgery | C Felony | Eight years |
| 9/12/96 | 82C01-9609-CF00863 | Circuit Court for Vanderburgh County, Indiana | Forgery | C Felony | Eight years |
| 9/12/96 | 82C01-9609-CF00863 | Circuit Court for Vanderburgh County, Indiana | Forgery | C Felony | Eight years |
| 6/10/96 | 82C01-9607-CF00668 | Circuit Court for Vanderburgh County, Indiana | Forgery | C Felony | Eight years |
| 6/10/96 | 82C01-9607-CF00668 | Circuit Court for Vanderburgh County, Indiana | Forgery | C Felony | Eight years |

---

[3] The sentencing memorandum was not included in the appellate record.

[4] The State's notice included two convictions for Class D felony attempted theft of property in Case No. 82D-02910-CF00239; however, the charging instrument and judgment form for Case No. 82D-02910-CF00239, as attached to the State's response to Petitioner's sentencing memorandum, reflect only one count of attempted theft of property. We believe that the inclusion of a second count of attempted theft of property was a typographical error.

| 6/15/96 | 82C01-9607-CF00668 | Circuit Court for Vanderburgh County, Indiana | Forgery | C Felony | Eight years |
|---------|--------------------|-----------------------------------------------|---------|----------|-------------|
| Not specified | 82C01-9607-CF00668 | Circuit Court for Vanderburgh County, Indiana | Violation of Habitual Motor Offender | Not specified | Ten years |

Twelve court appearances[5] related to the sentencing hearing occurred. Sentencing counsel articulated at the twelfth hearing that she needed more time to determine whether Petitioner was a Range II or Range III offender, that Petitioner was concerned about the issue, and that she wanted to explain the issue to Petitioner "at length."

At the May 15, 2019 sentencing hearing, sentencing counsel announced that, although Petitioner maintained that he was a Range II offender, he and the State had reached an agreement for the trial court to sentence Petitioner as a Range III offender. The agreed sentences were as follows: four years in Count 1, Class E felony evading arrest; thirteen years, six months in Count 2, Class C felony attempted carjacking; thirteen years, six months in Count 3, aggravated burglary; and eleven months, twenty-nine days in Count 4, Class A misdemeanor assault. The sentences were ordered to be served concurrently with one another and his twelve-year sentence in Cheatham County.

The trial court noted that the Range III sentencing range for the Class C felonies in Counts 2 and 3 was ten to fifteen years. The trial court further noted that an agreed sentence was not the same as a guilty plea and asked Petitioner to verify that he understood the sentence, that it had been fully explained to him, and that he was satisfied with sentencing counsel's representation. Petitioner answered affirmatively to each question, and the trial court entered the agreed sentence.

### *Post-Conviction Proceedings*

On August 1, 2019, Petitioner filed a pro se petition for post-conviction relief, alleging that trial counsel provided ineffective assistance. Petitioner argued that he "consulted with [trial counsel] about [Petitioner's] strategy during the trial and also [Petitioner's] objectives," which were pursuing a theory that he was not guilty of carjacking and aggravated burglary. Petitioner stated that trial counsel "went against his . . . strategy . . . when he never . . . question[ed] the intent in regards to the aggravated burglary or the carjacking" and instead "instructed" the jury to find Petitioner guilty of attempted

---

[5] The transcripts of the various court dates reflect that sentencing in this case was delayed, with Petitioner's agreement, until Petitioner's Cheatham County case was resolved.

carjacking. Petitioner cited to section 1.2[6] of the Rules of Professional Conduct, stating that "a lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall consult with the client about the means by which the client's objectives are to be accomplished." Tenn. Sup. Ct. R. 8, RPC 1.2(a).

Petitioner noted that trial counsel's strategy was based upon his belief that Petitioner would have been sentenced as a Range III offender on a conviction for carjacking and that the conviction for attempted carjacking "saved [Petitioner] fifteen years" of sentencing exposure. Petitioner submitted that trial counsel failed to realize that Petitioner would have been a Range I offender if sentenced for carjacking, a Class B felony, because his prior convictions were Class E felonies. Petitioner argued that, as a result of trial counsel's mistake, the jury convicted Petitioner of attempted carjacking, a Class C felony, which added three years to his sentence.

After post-conviction counsel was appointed, Petitioner filed a "Supplement to Petition for Relief from Conviction or Sentence for Clarification of Issues." In the supplement, Petitioner acknowledged that he did not file a direct appeal in his Montgomery County case. Petitioner stated that trial counsel's understanding of Petitioner's potential sentencing range was based upon the State's notice and that his defense strategy of admitting guilt to attempted carjacking was unreasonable because it "implied" that Petitioner was guilty of the other charged offenses.

At the post-conviction hearing, trial counsel testified that he was the elected Public Defender and that, during his time in private practice, he represented Petitioner. Trial counsel was appointed five or six weeks before the trial; he was not involved with Petitioner's initial guilty plea or subsequent withdrawal of the plea. Trial counsel met with Petitioner at the jail four or five times before trial.

Trial counsel testified that he had access to the discovery materials and the State's notice; he thought that he spoke with Petitioner about the notice but did not recall with certainty. Trial counsel noted that the notice was filed on February 5, 2016, a week or two before trial.

Trial counsel testified that, "Going into the trial, the strategy was going to be to argue that he didn't commit a burglary, because he didn't make it into the home. But that was changed when there was some testimony that came out about what the officer said." Trial counsel stated that he got the idea to argue that Petitioner was only guilty of attempted carjacking after Petitioner testified. He noted that, at that point, he was "kind of limited"

---

[6] Petitioner's handwriting was difficult to decipher, but the text he included corresponds to Rule 1.2.

- 15 -

in what he thought he could argue. Trial counsel said that he had previously used a strategy of admitting guilt to a lesser offense in plea negotiations. Trial counsel did not discuss the trial strategy with Petitioner before or during trial, and he did not think Petitioner knew he was going to "make that argument" in closing.

Trial counsel testified that he "imagine[d he] would have definitely researched whether or not" the Indiana convictions rendered Petitioner a Range III offender, although he did not obtain certified copies of the judgments. Trial counsel stated that a defendant had to have three or more Class C or D felony convictions in order to be classified as a Range III offender. Trial counsel said that carjacking was a Class B felony, and attempted carjacking was a Class C felony.

The State agreed to stipulate at the post-conviction hearing that Petitioner's Indiana convictions for forgery would be Class E felonies under Tennessee law, based upon the information in the indictments regarding the amount of the forged checks. The indictments and judgments were attached to the State's response to Petitioner's sentencing memorandum.

Trial counsel testified that, after trial, he had a discussion with Petitioner and subsequently sent him a letter. Petitioner introduced a copy of trial counsel's February 19, 2016 letter, in which trial counsel explained the filing timeline for a motion for new trial, direct appeal, and post-conviction petition. Trial counsel wrote,

> You can keep a copy of this letter as my admission that my strategy went against your wishes. My actions at your trial were what I thought was the best strategy.
>
> . . . .
>
> The DA never made an offer for your case after I was appointed. Your own statements to the investigator were enough to get a full conviction on all counts. There was no argument about identity, your car was registered to you and you left a shoe in the car from the [c]arjacking. My strategy was to convince the jury that you only attempted to [c]arjack that woman because it was your best shot. You were looking at a Felony B as a Range III offender which would put your sentencing range at 20-30 years at 45%. With your record it is likely the Judge will sentence you at or near the top of the range. A Felony C as a Range III offender has a sentencing range of 10-15 years at 45%. If the Judge determines you need the maximum sentence my actions at the trial likely saved you 15 years of sentencing.

- 16 -

> I do not expect you to be pleased with this outcome. I do not expect this to justify my actions in your mind. I simply want you to have this information if you choose to file a PCR.

Trial counsel acknowledged that, in light of Petitioner's prior record being comprised of Class E felonies, he would have been considered a Range I offender if he had been sentenced for a Class B felony. Trial counsel agreed that Class E convictions were considered for purposes of Class C felony sentencing. Trial counsel testified that he was not involved with Petitioner's sentencing.

On cross-examination, trial counsel testified that Petitioner was unhappy with the trial's outcome. He agreed that the State's notice was filed ten days before trial and that the parties did not have copies of the Indiana charging instruments at that time. Trial counsel admitted that he did not "catch" that the forgery convictions were Class E felonies. He agreed that, typically, "it's often not until sentencing that [the parties] had charging instruments and can ascertain what range someone is actually going to be." He further agreed that his decision to argue for an attempted carjacking conviction occurred after Petitioner testified.

Trial counsel testified that Petitioner was "not discussing much" with him during the trial because Petitioner was "very upset at the entire progress of the case." When asked whether Petitioner's decision to testify was "predicated upon discussions regarding range notices," trial counsel responded, "I don't believe so." He noted that he could not speak as to Petitioner's state of mind. Trial counsel agreed that the letter contained his explanation of the situation after the fact. Trial counsel denied that, until the filing of the post-conviction petition, Petitioner or anyone else had voiced a concern about counsel's having been mistaken about the sentencing range.

Trial counsel agreed that his argument for an attempted carjacking conviction was successful and that the evidence at trial was overwhelming. Trial counsel felt at the time that it was a better outcome than he anticipated, although Petitioner was very unhappy with it. Trial counsel noted his belief that it was a "good" verdict. Trial counsel stated that Petitioner received a sentence of thirteen years, six months on both Class C felonies, and that the sentences were concurrent with one another. He agreed that Petitioner's Range III status was accurate as to the aggravated burglary conviction.

Petitioner testified that he and trial counsel discussed the State's notice before trial, that counsel was "adamant" that he was a Range III offender based upon his Indiana convictions, and that Petitioner was "adamant that [he] was a Range I [o]ffender for any [C]lass 'B' felony that was pending." Petitioner averred that, if trial counsel had told him that his Indiana forgery convictions were Class E felonies under Tennessee law and that he

would have been sentenced as a Range I offender for a carjacking conviction, he would have pled guilty to carjacking. Petitioner noted that the carjacking conviction would have yielded a twelve-year sentence and that, before trial, he informed the trial court that he was uncomfortable with trial counsel's representing him because of "the [State's] notice, because I felt that he was interpreting it . . . wrong."

On cross-examination, Petitioner agreed that he requested to "fire" trial counsel and receive a continuance on the morning of trial. Petitioner stated that he "didn't get into specifics" with the trial court but that the State's notice was his "main reason." He said that he did not know how to express his concerns. When the State observed that, per the trial transcript, Petitioner told the trial court he wanted a new lawyer because trial counsel had promised him information in January and had not provided it in a timely manner, Petitioner maintained that he was "speaking of enhanced punishment," referring to the State's notice. He noted that the State had said that it was going to file the notice when he was entering his subsequently-withdrawn guilty plea. When confronted with the fact that the State's notice was not filed until February 2016, Petitioner maintained that one of the documents trial counsel promised him in January 2016 was the State's notice.

Petitioner testified that his discussion with the trial court on the first day of trial also included that he did not go into Mr. Hannon's home with the intent to commit a crime. He denied that all of the discussion was contained in the trial transcript. Petitioner stated that, at the time of trial, his "discontent" with trial counsel included their disagreement about the State's notice, as well as Petitioner's desire to adopt a strategy of challenging his intent to commit carjacking and aggravated burglary.

During argument, post-conviction counsel clarified that, for purposes of prejudice related to his sentencing range, Petitioner contended that, if he had been properly informed, he would have accepted the State's plea offer and not proceeded to trial. Post-conviction counsel noted that, to Petitioner's recollection, the State's original offer was for a twelve-year sentence, but that it was "just not in the record anywhere." The State responded that the trial transcript reflected that, on the morning of trial, Petitioner had the choice to enter an open plea or proceed to trial, and that the prosecutor made no further offers with a fixed sentence.

The post-conviction court entered a written order denying the petition on December 27, 2022. The post-conviction court found that trial counsel advised Petitioner that his statements to the police were enough to result in a conviction, that no argument existed as to Petitioner's identity, that Petitioner's shoe was found in Ms. Farrow's car, and that Petitioner was the registered owner of the Lexus involved in the police chase and crash. The post-conviction court further found that, based upon the potential for Petitioner to be found to be a Range III offender, trial counsel's strategy was to convince the jury that

- 18 -

Petitioner had only attempted a carjacking. The post-conviction court stated that trial counsel argued in closing that the jury should find Petitioner guilty of attempted carjacking and aggravated criminal trespass. The post-conviction court noted trial counsel's statement that the jury's verdict was better than he anticipated. The post-conviction court noted Petitioner's testimony that he had disagreed with trial counsel regarding his sentencing range, but counsel would not listen to him; that counsel failed to argue that Petitioner did not intend to commit a crime when he entered Mr. Hannon's home, the Knights of Columbus home, or Ms. Farrow's car; and that Petitioner was uncomfortable with trial counsel.

The post-conviction court found that Petitioner's sentence was imposed pursuant to an agreement between the parties and that the agreement provided for concurrent sentencing between the four counts of the indictment and his Cheatham County case. The post-conviction court further found that, at one of the sentencing hearing dates, sentencing counsel requested additional time to review the range status issue because Petitioner had questions about it, and sentencing counsel wished to explain the issue to him "at length." The post-conviction court also found that, prior to entering the sentence, the trial court asked Petitioner in open court if he understood the terms of the sentence and the agreement, to which he replied affirmatively. The post-conviction court noted that "it is recognized that an erroneous range classification can be waived by the action of the defendant. *Hicks v. State*, 945 S.W.2d 706, 708 (Tenn. 1997)." The post-conviction court further noted that a defendant's agreement to a sentence based upon a range classification "to which there is a question" is not deemed to be constitutional error. *See State v. Mahler*, 735 S.W.2d 226, 228 (Tenn. 1987).

The post-conviction court concluded that trial counsel's representation was not deficient, noting that it would have been deficient performance not to address lesser-included offenses. The post-conviction court found that Petitioner had waived any claim as to any deficiency "in addressing the Indiana convictions as qualifying . . . Petitioner as a Range III offender" by "virtue of the agreement and compromise entered into concerning the sentencing imposed in conjunction with the Cheatham County case."

Petitioner timely appealed.

### *Analysis*

On appeal, Petitioner contends that the post-conviction court erred in denying his claim that trial counsel provided ineffective assistance by (1) arguing that Petitioner was guilty of attempted carjacking without consulting with Petitioner and (2) by failing to determine the felony classification of Petitioner's Indiana convictions for purposes of Tennessee sentencing law. Petitioner also raises as a separate issue that "[t]he Circuit Court

erred by denying [Petitioner's] petition to set aside the sentence due to the actions of trial counsel," arguing that Petitioner was unable to make a voluntary and intelligent decision relative to the agreed sentence as a result of trial counsel's actions.

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## I.     *Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, this court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### a. Concession of guilt as to attempted carjacking

Petitioner contends that the post-conviction court erred in denying relief on this claim because the evidence showed that trial counsel provided ineffective assistance by conceding that he was guilty of attempted carjacking in closing argument, asserting that "[h]ad trial counsel not been adamant that the jury find [Petitioner] guilty, there is the possibility that [Petitioner's] testimony would have been enough to find him not guilty on the carjacking charge." Petitioner later argues that, if trial counsel had developed a strategy "that was in line with [Petitioner's] testimony," a possibility existed that the jury would have acquitted Petitioner "on some of the charges." Although Petitioner primarily discusses attempted carjacking, he also contests trial counsel's stating in his opening statement that Petitioner was guilty of theft and assault.

The State responds that, even if trial counsel's performance was deficient, Petitioner has not demonstrated that he was prejudiced. The State argues that Petitioner acknowledged his involvement in the crimes after his arrest and that he admitted at trial to having "lured" Ms. Farrow to her car, sitting in the driver's seat, and starting the car.

Although Petitioner frames this issue as one of ineffective assistance of counsel, the State in its brief draws our attention to a line of cases involving a defendant's Sixth Amendment right to autonomy. *See, e.g., McCoy v. Louisiana*, 584 U.S. 414 (2018). Because Petitioner raised no autonomy issue in his petition or supplement, and the post-conviction court did not issue findings of fact or conclusions of law related to an autonomy issue, we consider any such issue to be waived. *See Holland v. State*, 610 S.W.3d 450, 459 (Tenn. 2020) (emphasizing that this court lacks the authority to address post-conviction

issues that have been waived).  Accordingly, we will confine our review to Petitioner's ineffective assistance argument.

Petitioner contends that the post-conviction court erred in denying relief on Petitioner's claim that trial counsel provided ineffective assistance by failing to develop a defense strategy "that was in line with [Petitioner's] testimony" and by, instead, conceding during closing argument that Petitioner was guilty of attempted carjacking.  At the post-conviction hearing, trial counsel admitted that he did not discuss the defense strategy with Petitioner *at all* and that Petitioner was unaware trial counsel intended to concede guilt to attempted carjacking during closing argument.  In addressing this issue, the post-conviction court found that trial counsel's strategy was based upon Petitioner's police statement, the fact that no argument existed as to Petitioner's identity as the perpetrator, and the overall strength of the State's case.  However, trial counsel's failure to discuss the defense strategy with Petitioner is a concerning lapse in counsel's obligation to "consult with the client about the means by which the client's objectives are to be accomplished" as set out in two of the Rules of Professional Conduct.  Tenn. Sup. Ct. R. 8, RPC 1.2(a), 1.4(a)(2).  In its brief, the State acknowledges that trial counsel's failure was a "shortcoming" but argues that the post-conviction court did not err in denying relief because Petitioner has failed to show a reasonable probability of a different outcome had counsel adequately consulted with Petitioner.  We agree.

The post-conviction court found that Petitioner failed to show by clear and convincing evidence that he was prejudiced by any alleged deficiency considering the overwhelming evidence of his guilt at trial.  The definition of carjacking Detective Rosencrants gave Petitioner, which Petitioner agreed he "definitely did," was closer to the definition of attempted carjacking—"when you try to take someone's car by use of an assault[.]"  Carjacking, as pertinent to Petitioner's case, is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of . . . [f]orce or intimidation."  Tenn. Code Ann. § 39-13-404.  Criminal attempt is defined as, in relevant part, acting with the intent "to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."  Tenn. Code Ann § 39-12-101.

At trial, Ms. Farrow testified that Petitioner approached her at work and told her that her car's window was broken.  After Ms. Farrow came outside and told Petitioner that nothing was wrong with her car, he entered her car and started it with the key inside the car.  Ms. Farrow stated that she entered the front passenger side of the car and unsuccessfully tried to remove her car key from the ignition.  Ms. Farrow said that she and Petitioner fought over the gear shift and that Petitioner told her, "B--ch, don't fight me over your car."  Ms. Farrow stated that Petitioner started to drive forward while they traded

blows and that he ultimately drove the car into a ditch at the end of the driveway. Petitioner admitted at trial that he entered Ms. Farrow's car, placed the key that was inside the car in the ignition, started the car, shifted it into drive, and allowed the car to travel into a ditch, all while Ms. Farrow physically fought him and yelled that he was not going to take her car. Based upon Petitioner's own testimony, the evidence was sufficient for a jury to have found Petitioner guilty of carjacking or attempted carjacking, notwithstanding the defense strategy employed by trial counsel. Thus, the record does not preponderate against the post-conviction court's finding that Petitioner failed to show by clear and convincing evidence that, but for counsel's concession in closing argument that Petitioner was guilty of attempted carjacking, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Likewise, relative to his other convictions, we note that Petitioner admitted during his testimony that he was evading the police and that he struck Ms. Farrow.[7] Whether Petitioner entered Mr. Hannon's house was a factual question, and by its verdict, the jury credited Mr. and Ms. Hannon's testimony over that of Petitioner. Because Petitioner did not offer any evidence to suggest that, but for counsel's alleged deficiency, "the result of the proceeding would have been different" as to his convictions for evading arrest, aggravated burglary, and assault, the post-conviction court did not err in denying relief on this basis. *See id*.

### b. *Investigation of Indiana convictions*

Petitioner also contends that the post-conviction court erred in denying relief from the claim that trial counsel provided ineffective assistance by failing to properly determine the felony classification for Petitioner's Indiana convictions for purposes of sentencing. Petitioner asserts that trial counsel's failure in this regard led to trial counsel's conceding guilt for attempted carjacking, thereby exposing Petitioner to a longer sentence than would have been possible had he been convicted of carjacking. The State responds that the post-conviction court did not err as Petitioner failed to prove prejudice and that the record does not preponderate against the post-conviction court's finding that Petitioner "sought to receive the benefit of an agreement, which avoided the imposition of consecutive sentences[.]"

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of

_____

[7] Although the indictment for Count 4 is not in the appellate record, the parties' opening and closing statements at trial indicated that Count 4 referred to Petitioner's assaulting Ms. Farrow.

- 23 -

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

As a preliminary matter, Petitioner acknowledges that defense attorneys are generally not obligated to investigate "facially valid" judgments related to prior convictions. *See Veach v. State*, No. 01C01-9204-CR-00140, 1993 WL 75364, at *4 (Tenn. Crim. App. Mar. 18, 1993), *perm. app. denied* (Tenn. July 6, 1993); *see also Smith*, 2011 WL 3912811, at *12. Petitioner argues, though, that the out-of-state convictions in this case necessitated more investigation than would be required for in-state convictions. Petitioner cites no authority for this proposition. We note that Petitioner has not challenged the facial validity of the judgment forms but rather trial counsel's alleged failure to research and properly determine the felony classification for Petitioner's Indiana convictions for purposes of sentencing.

The record reflects that the State's notice was filed on February 5, 2016, and did not include supporting documentation; the prosecutor noted at the post-conviction hearing, and trial counsel affirmed, that it was common practice for the State not to obtain certified copies of the judgments or charging instruments until it was preparing for the sentencing hearing. However, at the post-conviction hearing, the parties agreed that Petitioner's Indiana forgery convictions were equivalent to Class E felonies in Tennessee due to the value of the forged instruments at issue or, in some instances, the lack of documentation in the charging instruments regarding value. Accordingly, based upon these prior convictions, Petitioner would have been a Range I standard offender for purposes of a Class B carjacking conviction, with a sentence range of eight to twelve years, but would have qualified as a Range III persistent offender for purposes of a Class C attempted carjacking conviction, with a sentence range of ten to fifteen years. *See* Tenn. Code Ann. §§ 40-35-105 (defining standard offender as a defendant not sentenced as a multiple, persistent, mitigated, or repeat violent offender); 40-35-107(a) (defining persistent offender as a defendant who has received "[a]ny combination of five . . . or more prior felony convictions within the conviction class or higher within the next two . . . lower felony classes"); 40-35-112(a)(2) (Range I sentence range for Class B felony); 40-35-112(c)(3) (Range III sentence range for Class C felony).

Trial counsel testified that he "imagine[d he] would have definitely researched whether or not" the Indiana convictions rendered Petitioner a Range III offender, although he did not obtain certified copies of the judgments. The post-conviction court made no findings related to the level of research trial counsel performed. Nevertheless, we conclude that the record does not preponderate against the post-conviction court's finding that Petitioner has not proven that trial counsel's alleged failure to research and properly determine the felony classification for Petitioner's Indiana convictions prejudiced him. Trial counsel did not represent Petitioner after trial, and Petitioner did not introduce any

evidence of how trial counsel's mistake in anticipating his sentencing range affected the subsequent sentencing negotiations. Petitioner did not call sentencing counsel as a witness during the post-conviction hearing, and Petitioner did not testify regarding any events that occurred during the three-year period between his trial and sentencing. The record does not preponderate against the post-conviction court's finding that the agreed sentence allowed Petitioner to avoid the possibility of consecutive sentencing between the counts of this case, as well as with the Cheatham County case. We note that sentencing counsel remarked at the final sentencing hearing that Petitioner maintained that he was a Range II offender but had decided to accept a Range III sentence in exchange for concurrent sentencing. The post-conviction court found, and the sentencing transcript reflects, that Petitioner asserted to the trial court that he understood the agreed sentence and that he was satisfied with it. Petitioner is not entitled to relief on this basis.

## II.      *Agreed sentence*

For the first time on appeal, Petitioner argues as a separate issue that the "Circuit Court erred in denying [his] petition to set aside the sentence on the attempted carjacking conviction due to the ineffective assistance of counsel."[8] The substance of Petitioner's argument is that, due to trial counsel's failure to research the Indiana convictions sufficiently, he did not have the appropriate information to make intelligent and voluntary decisions relative to the agreed sentence.

Generally, issues not raised in the post-conviction petition are subject to waiver. *See, e.g., Foley v. State*, No. M2018-01963-CCA-R3-CD, 2020 WL 957660, at *7 (Tenn. Crim. App. Feb. 27, 2020) (citing *Angel v. State*, No. E2018-01551-CCA-R3-PC, 2019 WL 6954186, at *7 (Tenn. Crim. App. Dec. 18, 2019)). In addition, this court is without authority to consider issues that were not raised at the post-conviction hearing or addressed by the post-conviction court. *Holland*, 610 S.W.3d at 459. To the extent that Petitioner challenges his agreed sentence as being unknowing or involuntarily entered, Petitioner has raised this issue for the first time on appeal, and it has been waived.

## ***Conclusion***

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[8] No petition to set aside the sentence is present in the record; we interpret Petitioner's contention as relating to the denial of his post-conviction petition.